IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **SARAH M. BURCHFIELD**          ) | |
| ) | |
| ) | |
| **Plaintiff**          ) | |
| ) | |
| vs.          ) | **CIVIL ACTION NO. 2:07-CV-2183-KOB** |
| ) | |
| ) | |
| **MICHAEL J. ASTRUE**          ) | |
| **COMMISSIONER OF**          ) | |
| **SOCIAL SECURITY**          ) | |
| ) | |
| ) | |
| **Defendant**          ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On February 15, 2005, the claimant, Sarah M. Burchfield, applied for disability insurance benefits under Title II of the Social Security Act and Supplemental Security Income Benefits under Title XVI of the Social Security Act. (R. 64-66). The claimant alleges disability commencing on November 30, 2000 because of obesity, back problems, high blood pressure, diabetes, and sleep apnea. (R. 18).  The Commissioner denied the claim initially,  the claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on April 26, 2006.  (R. 18, 39-40, 202-236). In a decision dated November 30, 2006, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and thus, was ineligible for disability or SSI benefits. (R. 18-24). On October 5, 2007, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the

1

Social Security Administration. (R. 3-5). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to § 205(g) and § 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court will REVERSE the decision and REMAND it to the Commissioner for further proceedings.

## II. ISSUES PRESENTED

The claimant raises two issues for review: (1) whether the ALJ failed to properly consider her obesity; and (2) whether the ALJ failed to properly report and consider evidence from claimant's examining source, Dr. Mathews.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[1] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

To make this determination the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[2]

Ruling SSR 02-1p acknowledges the Social Security Administration's deletion of "obesity" as a separate listing, but ensures that adjudicators still consider the potential effects of

---

[1] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

[2] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g., Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981)(Unit A).

obesity under the body system listings and "at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." SSR 02-1p, intro. In paragraph eight, the ruling states that "[o]besity can cause limitation of function," noting its potential effects on exertional functions such as "sitting, standing, walking, lifting, carrying, pushing, and pulling;" on postural limitations such as "climbing, balance, stooping, and crouching;" and on nonexertional limitations such as the inability to tolerate extreme heat, and drowsiness from obesity-related sleep apnea. SSR 02-1p, ¶ 8.

The ALJ must state with particularity the weight given medical opinions and the reasons therfor. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

## VI. FACTS

The claimant was 44 years old on June 8, 2005, and has a tenth grade level education (R. 204-05). She previously worked as a concession's attendant from January 1996 to 1997; a day care worker from October of 2000 until July of 2001; and a care-giver from January of 2003 to January of 2006. (R. 205-07). In the last position, she worked part-time for a total of twelve hours per week. (R. 209). According to the claimant, the onset of disability began on November 30, 2000, because of low back pain, obesity, hypertension, and diabetes mellitus. (R. 20). The claimant meets insured status requirements through March 31, 2009. (R. 20).

*A. Medical Records*

The medical records reflect that the claimant visited Cooper Green Hospital on September 1, 1999 complaining of a cough. The attending physician diagnosed bronchitis, and pleuritis (inflammation of the covering of the lungs) and noted that she was morbidly obese. (R. 159-60). Records indicate continued treatment at the Cooper Green Hospital Clinic from 2001 to

2005, with a number of different doctors seeing the claimant over the period of nearly four years.

On October 3, 2001, she went to the Cooper Green Emergency Room complaining of excessive sleepiness, a severe headache, and a shoulder pain that she described as a "dull ache," all of which had been persisting for the past three weeks. The doctor noted that she was weak, short of breath, nauseated, and had head pain, but also listed her as stable and improved. She received a diagnosis of uncontrolled hypertension and headache, as well as non-compliance in taking her medicine, with a reported blood pressure of 150/100. The records do not reflect her weight at this point. (R. 156-56, 70).

The claimant visited the Cooper Green Hospital Clinic on February 14, 2002, complaining of pain when she coughed. She received a diagnosis of hypertension, muscle spasms, and probable sleep apnea, and had a blood pressure of 155/82 and a weight of 350 pounds. (R. 169). On April 17, 2002, she claimed to be suffering from fatigue as well as chest and arm pain. The doctor diagnosed fatigue, but commented that her lungs were clear and her hypertension was better. Her reported blood pressure was 117/75 and she weighed 347 pounds at this time. (R. 168). At another clinic visit on March 21, 2003, the claimant received the diagnosis of vertigo and sleep apnea and her blood pressure and weight were 123/67 and 348 pounds, respectively. (R. 165).

The record reflects that the claimant returned to the Cooper Green Emergency Room on June 12, 2003, at which point she complained of nausea and intermittent pain in her left arm over a period of two months. Her blood pressure was 140/89 and the doctor diagnosed her with, among other things, new onset diabetes and morbid obesity, though noting that her condition was stable. (R. 153-55).

On October 13, 2004, the claimant saw Dr. Chandra Haritha at the Cooper Green Hospital Clinic, reporting lower back pain; leg numbness; inability to stand or bend for long periods of time; neck, arm, and lung pain; retention of "a lot" of fluid; and difficulty sleeping, and further, claiming that these symptoms had been occurring for the past two years. Dr. Haritha noted that the patient had not been receiving regular follow up care from any physician and that although she was aware of her elevated blood sugar, she was not taking prescribed medications. The claimant had a blood pressure reading of 136/73 and weighed 338 pounds, and the doctor's diagnoses included hypertension and obesity. She also ordered the claimant to attend classes and monitor her blood pressure three times per day. (R. 162-64). A record from the next day, October 14, 2004, lists the following diagnoses: hypertension; sleep apnea; obesity; low back pain; neck pain; diabetes milletus, type two, uncontrolled. (R. 161).

On May 2, 2005, the claimant saw Bruce M. Pava, M.D., a consulting internist for a disability examination. Dr. Pava noted that she was morbidly obese at 311 pounds and 65 inches tall, and that she had a blood pressure of 170/100. Her chest was clear to percussion and auscultation (the procedure of listening to the sounds within the body). The doctor stated that the "patient [was] able to walk on toes and heels and rise from a mid-squatting position without difficulty," that she experienced "full active motion of all joints, extremities and spine," and that her pulmonary function test was invalid due to poor patient effort. Dr. Pava diagnosed morbid obesity, hypertension, chronic low back pain, and type II diabetes mellitus, but saw "no medical contraindication to sedentary type work." (R. 172-73; 176[PFT]).

The claimant returned to Dr. Haritha at the Cooper Green Hospital Clinic on June 15, 2005, complaining of swelling in her legs and feet. Her blood pressure was 132/81, her weight

was 338 pounds, and she received the following diagnoses: hypertension; sleep apnea; neck pain; obesity; and diabetes mellitis, type two, uncontrolled. (R. 187). Her blood sugar was elevated. Dr. Hartitha characterized her obesity as morbid, explained to claimant her condition, and encouraged her to keep her weight down.  On August 10, 2005, she visited the same clinic with chest and muscle spasms and received essentially the same diagnoses. Her blood pressure was 133/76 and she weighed 310 pounds. (R. 186).

The Physical Residual Functional Capacity Assessment performed by the non-physician disability examiner indicated a primary diagnosis of hypertension, a secondary diagnosis of obesity, and the assessment listed diabetes mellitus type II as another alleged impairment. It reported that the claimant could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk six hours in an eight-hour work day; sit six hours in an eight-hour work day; push or pull unlimited weight other than the lift and carry limitation; occasionally climb, balance, stoop, kneel, crouch, and crawl; and never climb a ladder, rope, or scaffolds. The assessment based postural findings on Dr. Pava's records dated May 2, 2005.  The assessment additionally noted that the claimant should avoid concentrated exposure to extreme cold, extreme heat, humidity, vibration, fumes, odors, dusts, gases, and poor ventilation. The disability assessor concluded that the medical evidence supported the claimant's allegations regarding symptoms, but that "the alleged severity of impairments are disproportionate to the expected severity of the MDI [medical determinable impairment]" and that "[s]tatements regarding function are partially credible." (R. 177-84, quoted language at R. 182).  He noted that his conclusions were significantly different from the medical exam of Dr. Pava, an examining source, who stated that "the physical exam shows no contraindication to sedentary work."  However, the assessor

7

explained that decisions on work capacity were reserved to the adjudicator, and thus, he gave this statement non-controlling weight. (R. 183).

  *B. Hearing*

On April 26, 2006, the ALJ held a hearing on the claimant's application for benefits. The claimant testified that she previously worked as both a care-giver on two different occasions for individuals through Gentiva Help Services. The most recent occasion was from January 1, 2003 until January of 2006. Her duties required her to help the "little lady," including assisting her in and out of the bathtub and shower. The claimant secured the position by applying for the job and worked five days a week, for two hours three days a week and three hours two days a week for a total of twelve hours per week. The employment ended when the employer suffered from a heart attack and could no longer live at home. When asked if she was currently seeking work, the claimant responded that she was not because of her lack of access to a car and inability to secure other transportation. She also conditioned her ability to work on whether the job required her to sit or stand for too long. (R. 206-11).

In describing her medical problems, the claimant affirmed that her weight and height were 311 pounds and 5'5" in May of 2005, but she was unable to assert whether she had gained or lost weight since that time because the fluid on her body caused her to weigh more at times. She experienced swelling, for which she had been given the drug Lasix. She claimed that she would be unable to work an entire day because she could not stand on her feet and that even in a sitting job, sitting for more than 15 minutes caused pain in her back that radiated down her right leg. Potentially, the best position she could get in would be to sit up on the edge of her chair. She stated that after walking a few blocks she would be forced to sit down and would experience

problems. If she attempted to stand for an extended period, her right leg would go numb and she would be forced to sit down after a few minutes. Her weight problems prohibited her from climbing stairs. The claimant testified that she lived with her daughter and daughter's husband, as well as with her son, that she had difficulty bathing and dressing, and that she was unable to drive long distances because that activity required her to sit for long periods of time. (R. 213-17).

   The claimant described her muscle spasms, saying her shoulders hurt across the back and down her left arm. She asserted that she had sleep apnea but did not have a machine and could not sleep on her back because that position prevented her from breathing. She did not sleep through the nights and her body ached when she woke up. She also stated that she suffered from diabetes and owned a machine to check her blood sugar, but was unable to afford the "things" that go in it because they cost too much. The last time she visited the doctor, her blood pressure was 160/90. With regard to household chores, she worked in the kitchen but had to sit down frequently, and expressed that if she exerted too much at one time she hurt all over. In a recent visit to the Emergency Room, she received a prescription for pain medicine, but was unable to afford to fill it because of finances. She experienced swelling in her legs and feet, as well as around her lungs. She claimed that if she failed to take her Lasix, she could not breathe. With regard to other medication, the Glucophage made her sick every morning. She had problems with fatigue and stated that she was tired all the time. When asked about the cause of her back and leg pain, she stated that she did not know, as X-rays had never been performed when she received treatment at Cooper Green. She believed the cause of her shortness of breath was a weight and fluid problem. Her main problems were breathing and back pain, all of which she had reported to a doctor, although treatment had not occurred because she often missed her appointments due to

lack of transportation. The ALJ clarified that the claimant lived with her daughter and that the daughter paid the bills, although the claimant helped when she was working. (R. 217-25).

The Vocational Expert testified that the claimant's significant work was that of a concession's attendant, which was light and unskilled. The position of home health aide was medium and unskilled and, as described, performed at a light level. As a daycare worker, the claimant's position was light and unskilled and occasionally required bending and stooping, but in the range of light work. It involved some sitting and standing, but was primarily a standing job. The VE asserted that some entry-level light jobs existed at the light and sedentary level in which the claimant would be permitted to sit and stand, assuming she could work for 8 hours a day. Examples of such jobs were information clerks, inspectors and cashiers. Other light jobs included checkers, examiners, and simple machine operators, for example filling, packaging, and glueing. In the state of Alabama, approximately 5,000 sedentary jobs existed and approximately 8- to 9,000 light jobs existed.

The VE explained stated that pain can impact a person's ability to work, but that mild to moderate pain would not preclude working. Moderately severe or severe pain, however, would preclude work because of the effect on concentration, focus, and attendance. If an employee in these type jobs missed more than ten to fifteen working days per year, those absences would cause problems with the job. Fatigue could also affect working capacity, and as the claimant described her own fatigue, that level of fatigue would fall in the moderately severe to severe range. The VE affirmed that if the claimant was experiencing the claimed level of pain and fatigue on a regular basis, that difficulty would prevent her from working, primarily because of the frequency with which she would have to change positions; she would be unable to sustain a

job that required 8 hours a day, 40 hours a week. (R. 227-34).

At the hearing, the ALJ agreed to provide the claimant an additional time period of thirty days to obtain a medical exam at Jefferson Clinic through Cooper Green Hospital and to submit a report as part of the record.

### C. Post-hearing Submission

At the request of the claimant's representative, on May 2, 2006, Ronnie E. Mathews, M.D., an internist, performed a physical examination of claimant to effect a medical disability determination. In his report on that exam, Dr. Mathews indicated that the claimant's complaints were: constant back pain measuring 7-9 on a scale of 10 and aggravated by prolonged activity such as standing, sitting, or walking; right leg pain; obesity; hypertension; and diabetes. Dr. Mathews then proceeded to review her medical history, noting her emergency room visits, the progression of her back pain, her inability to afford treatment or medication, and her reports of difficulty sleeping. At the time of the examination, the claimant had a blood pressure of 140/80 and her weight was 329 pounds; Dr. Mathews characterized her obesity as "morbid." Dr. Mathews reported that she was uncomfortable during portions of the range of motion testing but was able to get on the exam table without difficulty; that her lungs sounded clear; that she had two or more non-pitting edema (observable swelling from fluid accumulation that does not result in a persistent indentation when pressure is applied) in her bilateral lower extremities; that her gait was normal; that she was able to heel walk, toe walk, and tandem gait with assistance; and that she was unable to squat and bend over. All of her ranges of motion were normal with the exception of the flexion being decreased to 45 degrees in the lumbar spine. Dr. Mathews diagnosed the claimant with chronic back pain based on decreased range of motion upon flexion,

and suggested that although she could possibly benefit from therapy, she would have difficulty affording it. Further diagnoses included hypertension, which records indicated was uncontrolled and unmedicated due to finances; diabetes, which was also uncontrolled because of the inability to afford medicine; and obesity, which affected all of her other problems but was difficult to control because of her chronic back pain. (R. 190-94).

Dr. Mathews also included a Physical Capacities Evaluation, which indicated the claimant could lift or carry 20 pounds; could sit for five hours during an eight-hour work day; could stand or walk for one hour; could occasionally push/pull/climb stairs and reach; could never bend or stoop; and should not operate motor vehicles or work around hazardous machinery. (R. 195). The Clinical Assessment of Pain stated that "pain is present to such an extent as to be distraction to adequate performance of daily activities or work;" that physical activity "greatly increased pain and to such a degree as to cause distraction from tasks or total abandonment of tasks;" and that "drug side effects can be expected to be severe and to limit effectiveness due to distraction, inattention, drowsiness, etc." The doctor concluded that the patient's underlying medical condition was consistent with the pain she experienced. (R. 196-97).

Dr. Mathews's Clinical Assessment of Fatigue/Weakness recorded that "fatigue/weakness is present to such an extent as to negatively affect adequate performance of daily activities or work," that physical activity "greatly increased fatigue/weakness and to such a degree as to cause total abandonment of tasks," and that "drug side effects can be expected to be severe and to limit effectiveness due to distraction, inattention, drowsiness, etc." Dr. Mathews indicated that the patient had an underlying medical condition consistent with the fatigue/weakness she experienced. (R. 198-99).

As Dr. Mathews's report was within the thirty day period that the ALJ allotted for post-hearing submission of medical exam reports, the ALJ included that report in the record.

C. *The ALJ's Opinion*

In his decision dated November 30, 2006, the ALJ found that the claimant met the insured status requirements of the Social Security Act through March 31, 2009. The claimant had not engaged in substantial gainful activity since November 30, 2000 and had the severe impairments of low back pain, obesity, hypertension and diabetes mellitus, which had combined to produce more than minimal functional limitations that lasted at least twelve months. He found that the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments, as no medical evidence existed to support the severity of the allegations. He further found that the claimant had the residual functional capacity to perform both a light and sedentary level of physical exertion and should have a sit/stand work option. (R. 20-21).

In support of this conclusion, the ALJ related the medical evidence and stated that "[n]o treating or consulting source, indicated that the claimant is not able of [sic] functioning independently or not capable of performing at least some type of work at a sedentary or light level of physical exertion." (R. 22). He further stated:

> Dr. Mathews indicated that, without the claimant's alleged level of pain/fatigue/weakness, the claimant was capable of a light to sedentary level of physical exertion. The undersigned finds that given the balance of the evidence in file and that this examination was a one time exam, that there is little to support the claimant's allegations of pain.

(R. 22). The ALJ found that "the claimant's medically determinable impairments could

reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 21). After reviewing her medical history, he asserted that she did not regularly see a doctor, only took over the counter pain medication, and did not lose weight when advised to do so. She had no hospitalizations, surgeries, or recommended surgeries, and no treating or consulting physician that indicated that she could not at least perform sedentary or light work. The claimant's reports of her daily activities, particularly as a care giver through January 2006, were inconsistent with her claimed limitations and her statements were inconsistent with the evidence as a whole. (R. 22).

      The ALJ further found that the claimant was a "younger individual" who was unable to perform any past relevant work, as those jobs required light to medium physical exertion and were performed primarily while standing. Transferability of job skills was not an issue because the claimant's past relevant work was unskilled. He also decided that jobs existed in significant numbers in the national economy that the claimant could perform. To support this conclusion, he cited the vocational expert's opinion that, given the claimant's circumstances, she could perform the requirements of representative occupations such as a cashier, and inspector, or an information clerk, of which over 14,000 jobs existed in Alabama. The ALJ found that the testimony was consistent with the dictionary of Occupational Titles, and that a finding of "not disabled" was appropriate. In conclusion, he stated that the claimant had not been under a "disability," as defined in the Social Security Act, from November 30, 2000 through the date of the decision. (R. 23-24). Following the decision, the claimant requested review, and the Appeals Council subsequently denied her request. (R. 3,6).

## VII.  DISCUSSION

*A.  The ALJ's Addressing of Obesity*

No party disputes the fact that claimant meets the definition of obese; based on her weight and height, she meets the guidelines for level III obesity, also known as "extreme obesity." *See* SSR-0201p § 1.  However, the claimant alleges that the ALJ erred by failing to address "obesity and its effects on her residual functional capacity." (Pl.'s Br. [doc.8] at 5).  She cites two cases in support of her allegations: *Thomason v. Barnhart*, 344 F. Supp. 2d 1326 (N.D. Ala. 2004), and *Early v. Astrue*, 481 F. Supp. 2d 1233 (N.D. Ala. 2007).

The court finds that both of these cases are distinguishable from the present case.  The ALJs in those cases did not list obesity as a severe impairment in step two of their analyses nor did they make more than a passing reference to that condition in the remaining steps.  In the instant case, however, the ALJ did include obesity as a severe impairment in step two, indicating he was addressing that impairment, alone and in combination, throughout his disability analysis. Further, the ALJ in the instant case referred to claimant's obesity and weight ten times throughout his analysis, threading facts about her obesity into his discussion.

Claimant argues that the ALJ could not have properly evaluated her obesity because the opinion did not cite to SSR 02-1p, a policy interpretation ruling for the evaluation of obesity under Titles II and XVI.  An ALJ, however, is not required to cite to particular cases or regulations or use certain phrases or formulations as long as the court can determine that the ALJ applied the proper statutory or regulatory requirements and complied with controlling case law. *Jamison v. Bowen*, 814 F.2d 585, 588-89 (11th Cir. 1987).  Accordingly, the court finds that the ALJ's failure to cite SSR 02-1p is not an error standing alone, and the court will address whether

the ALJ's analysis comports with that ruling's guidance on the evaluation of obesity.

Ruling SSR 02-1p acknowledges the Social Security Administration's deletion of obesity as a separate listing, but ensures that adjudicators still consider the potential effects of obesity under the body system listings and "at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." SSR 02-1p, intro. In paragraph eight, the ruling states that "[o]besity can cause limitation of function," noting its potential effects on exertional functions such as "sitting, standing, walking, lifting, carrying, pushing, and pulling;" on postural limitations such as "climbing, balance, stooping, and crouching;" and on nonexertional limitations such as the inability to tolerate extreme heat, and drowsiness from obesity-related sleep apnea. SSR 02-1p, ¶ 8.

Although the claimant in the instant case argues that the ALJ did not consider her obesity's effect on her residual functional capacity, the court disagrees. The ALJ began his discussion of the claimant's residual functional capacity by focusing directly on the claim that her obesity limited her ability to function. His discussion of the medical evidence relating to her alleged limitations included ten references to her weight or obesity. He explained why, in light of the medical evidence and the daily activities of record, her claim about the extent of her limitations was not fully credible. Accordingly, the court finds that the ALJ's evaluation of the claimant's residual functional capacity did include a proper consideration of the potential effects of her obesity.

 B. *The ALJ's Treatment of Dr. Mathews's Opinion*

Claimant further argues that the ALJ erred in his treatment of the opinion of Dr. Ronnie Mathews, an internist who conducted a post-hearing consultative examination of claimant at the

request of her representative. In her brief, the claimant states that "the ALJ purports to give Dr. Mathews [sic] opinion credible weight" but notes that an acceptance of Dr. Mathews's findings and opinions would render the claimant disabled and unable to perform the light and sedentary level jobs that the ALJ identifies. (Pl.'s Br. [doc. 8] 6).

Multiple findings listed in Dr. Mathews's opinion would indeed militate against claimant's ability to work full-time. For example, Dr. Mathews's physical capacities evaluation found that claimant was able to sit only up to five hours and stand/walk up to one hour in an eight-hour work period, indicating that she would not have the capacity to work a full eight-hour day. He also found that claimant experienced pain/fatigue/weakness "to such an extent as to be distracting to adequate performance of daily activities or work." (R. 195-99). Further, Dr. Mathews found that she could *never* stoop or bend, although SSR 83-14 states that "to perform substantially all of the exertional requirements of most sedentary and light jobs, a person . . . would need to stoop only *occasionally*." SSR 83-14 (emphasis added). Contrary to Dr. Mathews's findings, the ALJ did not identify the inability to stoop or bend as a limitation in claimant's residual functional capacity. The jobs that he and the Vocational Expert identified for the claimant fit within light and sedentary levels with sit-stand options, but the ALJ did not ask the VE to identify such jobs with no stooping and bending. In light of these findings, if the ALJ did fully accept Dr. Mathews's opinion, then his finding of no disability would represent error, as it would not be undergirded by substantial evidence.

Accordingly, the court looks to the ALJ's opinion to determine what weight he accorded Dr. Mathews's opinion. An ALJ must "state with particularity the weight he gave the different medical opinions and the reasons therefor." *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir.

1987).

In the instant case, the court acknowledges having difficulty determining what weight the ALJ assigned to any doctor's opinion. Although the ALJ began his RFC analysis with a recitation of the medical evidence, when he then applied that evidence to a credibility analysis, he did not specify what weight he gave the opinions of Dr. Pava or Dr. Mathews, as he was required to do. At one point in his opinion, the ALJ appeared to be signaling his full acceptance of all doctors' findings, stating: "No treating or consulting source, indicated that the claimant is not able of [sic] functioning independently or not capable of performing at least some type of work at a sedentary or light level of physical exertion." (R. 22). This statement was true at the time of the hearing in April of 2006, but it was untrue in light of Dr. Mathews's May 2006 report, which was submitted within the time period set by the ALJ. In any event, the ALJ's statement engenders confusion not only because of its inaccuracy but also because it is inconsistent with subsequent statements in the opinion.

For example, the ALJ proceeds to acknowledge, albeit obliquely, that Dr. Mathews's opinion is not fully consistent with the ALJ's RFC findings:

> Dr. Mathews indicated that, without the claimant's alleged level of pain/fatigue/weakness, the claimant was capable of a light to sedentary level of physical exertion. The undersigned finds that given the balance of the evidence in file and that this examination was a one time exam, that there is little to support the claimant's allegations of pain.

(R. 22). In effect, the ALJ says that Dr. Mathews's opinion was consistent with his finding that she could do light and sedentary work, *except for* Dr. Mathews's findings that the claimant experienced too much pain/fatigue/weakness to work. However, the claims of

18

pain/fatigue/weakness are not severable from the rest of Dr. Mathews's opinion; they are the crux of his opinion and of claimant's assertion of disability. The ALJ cannot reject the main thrust of Dr. Mathews's opinion and yet insist that what vestige remains would support his RFC findings. Even if he could, the balance of Dr. Mathews's report simply does not support the ALJ's RFC findings. Dr. Mathews found that the claimant could never bend or stoop and could only sit/stand/walk for a total of six hours in a work day, and these findings are also inconsistent with the ALJ's RFC findings.

A careful reading of the ALJ's opinion results in the conviction that he, in effect, rejected Dr. Mathews's opinion. His finding that the claimant could perform light *and* sedentary work also conflicts in part with Dr. Pava's opinion, which found "no medical contraindication to sedentary type work."[3] (R. 173). Accordingly, the only opinion completely consistent with the ALJ's RFC findings – and the only opinion to which the ALJ expressly gives "significant weight" – is the Physical Residual Functional Capacity Assessment prepared by the non-physician disability examiner. Under the authority of current rules to conduct tests of disability determination procedures, the ALJ could consider the functional assessment of the non-physician disability examiner and was not required to seek a physician's opinion on the issue of equivalence. *See* Modifications to the Disability Determination Procedures, Extension of Testing of Some Disability Redesign Features, 71 Fed. Reg. 45890, 45890, 2006 WL 2283653 (August 10, 2006); 20 C.F.R. §§ 404.906, 416.1406. However, the court finds troubling the fact that the ALJ's findings are inconsistent with *both* doctor consultants. And, the ALJ's insistence that his

---

[3]The court recognizes that the determination of the level of work claimant can perform is ultimately one reserved to the Commissioner; however, the court nevertheless notes the conflict.

findings are *not* inconsistent with any treating or consulting source, is particularly disturbing.

Under his application of the pain standard and the ensuing credibility analysis, the ALJ provides several explanations for his rejection of claimant's statements about the intensity of her pain, and the court need not address that analysis. The inaccuracies and inconsistencies in the ALJ opinion raise confusion and render this court unable to determine that substantial evidence exists to support the ALJ's findings. Accordingly, the court will reverse and remand the case to the Commissioner to clear up the confusion.

## VIII.  CONCLUSION

For the reasons stated, the court will REVERSE and REMAND this case to the Commissioner for proceedings in accordance with this opinion. The court will enter a separate Order consistent with this opinion.

Dated this 24th day of September, 2009.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE